**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) |
| **JULIAN R. BROWN and ALLIANCE INVESTMENT MANAGEMENT LIMITED,** | ) ) ) |
| **Defendants.** | ) ) ) ) |
| _____ | ) |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges:

1.      This civil law enforcement action arises out of massive international fraud scheme orchestrated primarily by asset manager Nikolai S. Battoo and entities under his control. From at least 2008 until September 2012, Battoo concealed approximately $150 million of trading losses from investors by reporting false returns and asset values and misappropriated at least $45 million of investor funds to support his flamboyant lifestyle. Battoo's scheme, however, would not have gotten off the ground without the substantial assistance provided by Defendants Alliance Investment Management Limited

("AIM") and Julian R. Brown, AIM's President.

2.      From 2004 through September 2012, Battoo pitched himself as a successful asset manager with a track record of exceptional risk adjusted returns – one unblemished by the financial crisis of 2008. The truth, however, was that Battoo's investments lost approximately $150 million in 2008.  Rather than come clean to his investors about the crushing losses, Battoo embarked on a years-long campaign of lies and deceit to conceal them and to protect his reputation as a world class money manager. Battoo's fraud continued unabated until September 2012, when the SEC and CFTC filed emergency enforcement actions in this Court to put a halt to the scheme.

3.      Defendants Brown and AIM played a critical role in the success of Battoo's fraud. AIM, a foreign securities broker-dealer, pretended to be an independent custodian safeguarding the securities and other assets invested in Battoo's investment program.

4.      In reality, AIM were neither independent from Battoo nor custodians for investors. Brown and AIM enjoyed a cozy and profitable relationship with Battoo, which was anything but arms-length. They at times shared office space, a P.O. Box, telephone and fax numbers, and a common employee. Battoo even infused AIM with $5 million of investor money to help keep AIM solvent.

5.      Moreover, contrary to Brown's and AIM's representations to

investors and their agents, AIM was never a true custodian for Battoo's

investors. Since at least 2009, AIM did not have custody of most of the

securities and other assets listed on the account statements sent to Battoo's

investors. When AIM received investment money from investors, Brown

handed over most of it to Battoo, who used it freely to support his lavish

lifestyle – and to reward AIM.

6.      Because AIM did not have custody of the securities Battoo was

purportedly purchasing for investors, Brown and AIM could not prepare

investor account statements themselves. So they let Battoo do it.

7.      Brown and AIM shipped blank AIM letterhead to Battoo, who

used it to create account statements. After receiving the completed account

statements from Battoo, Brown and AIM willingly sent them to auditors and

other investor representatives, leaving the recipients with the misperception that

the information in them had been provided and verified by AIM, the supposed

independent custodian.

8.      Not surprisingly, the account statements Brown and AIM sent out

were a figment of Battoo's criminal imagination. They wildly overstated the

value of assets in investor accounts, including by listing investments that were

never owned by the investors. As of the end of 2009, AIM issued account

statements that overstated investor assets by at least $148 million.

9.      As part of the charade, AIM and Brown periodically sent out

account statements in response to asset verification requests by accountants acting on behalf of Battoo's investors.

10.     Brown's and AIM's complicity and direct participation allowed Battoo's massive investment fraud to flourish in the shadows for years. Believing their investments were both profitable and securely in AIM's custody, investors kept feeding more and more money – tens-of-millions of dollars – into Battoo's global fraud scheme. The longer the fraud continued, the bigger it grew; the bigger it grew, the more money Brown and AIM made.

## JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)].

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

13.     Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. §

1391(b). Acts, practices and courses of business constituting violations alleged herein have occurred within the Northern District of Illinois and elsewhere.

14.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

15.     **Alliance Investment Management Limited** is a Bahamian broker-dealer registered with the Securities Commission of the Bahamas. AIM, which has four employees, is a wholly owned subsidiary of Benchmark Bahamas Limited, a publicly traded investment company listed on the Bahamas International Securities Exchange. AIM claimed to serve as the custodian for assets invested as part of Battoo's asset management program, which operated under the trade name "Private International Wealth Management" ("PIWM"). Over the years, Battoo and AIM have shared a Bahamian office space, a P.O. Box, a telephone number, a fax number, and at least one employee.

16.     **Julian R. Brown** is a resident of the Bahamas and the president and a director of AIM. According to marketing materials provided to prospective PIWM investors, Brown was a member of the Professional Executive Board and Investment Advisory Board for PIWM.

## RELATED PARTIES

17.     During the times alleged herein, **Nikolai S. Battoo** was an alternative investment manager who claimed to have $1.5 billion in assets under management, including more than $200 million for the benefit of U.S. investors.  Battoo was the principal of BC Capital Group S.A. and BC Capital Group Limited.  Battoo controlled and served as the investment adviser to several hedge fund families and for PIWM, a brand name under which he managed a number of portfolios.

18.     Up until at least 2009, Battoo maintained a residence and an office in Florida.  Battoo is a named defendant in civil enforcement actions filed by the SEC and the Commodity Futures Trading Commission ("CFTC") alleging that he defrauded investors by concealing trading losses, and by providing investors with false holdings and account value information and fictitious investment returns.  *See SEC v. Battoo, et al.*, 12 C 7125 (N.D. Ill.) ("SEC Litigation"); *CFTC v. Battoo, et al.*, 12 C 7127 (N.D. Ill.) ("CFTC Litigation"). Orders of default have been entered by this Court against Battoo and his related entities in both the SEC and CFTC Litigation.

19.     During the times alleged herein, **BC Capital Group S.A. ("BC Panama")** was incorporated under the laws of the Republic of Panama.  Battoo was its principal. BC Panama served as the umbrella company for Battoo's investment management business and the "manager and managing company"

6

of the PIWM portfolios. BC Panama was also named as a defendant in *SEC v. Battoo, et al*, 12 C 7125 (N.D. Ill.).

20.     During the times alleged herein, **BC Capital Group Limited ("BC Hong Kong")** was incorporated under the laws of Hong Kong. Battoo was its principal. BC Hong Kong was the "appointed financial investment advisor" for the PIWM portfolios and a party to the investment management agreements through which U.S. residents directed funds to Battoo and his PIWM investment program. BC Hong Kong was also named as a defendant in *SEC v. Battoo, et al*, 12 C 7125 (N.D. Ill.).

21.     Battoo, BC Panama, and BC Hong Kong charged and collected fees for managing and advising the PIWM investment program. BC Panama and BC Hong Kong are sometimes collectively referred to in this complaint as the "BC Entities."

## FACTS

### BATTOO AND HIS PIWM INVESTMENT PROGRAM

22.     From 2004 through at least September 2012, Battoo advertised himself as a highly successful asset manager. During this period, Battoo raised more than $400 million from investors located in many different countries and purportedly managed more than $200 million for the benefit of U.S investors. Prior to starting his investment management business, Battoo held a number of different jobs in the United States, including as a cook at a Florida restaurant.

23.     Battoo managed portfolios of assets for hedge funds he controlled and for individual portfolios.  Battoo, through various entities, was investment adviser for several hedge fund families, including:  Anchor Hedge funds, Galaxy Fund, FuturesOne Diversified funds, FuturesOne Innovative funds, and Phi R (Squared) funds.

24.     Battoo was also investment adviser for investment portfolios managed under the PIWM trade name.  Investors participated in Battoo's PIWM program by investing in individual "mandates" managed by Battoo. Battoo's mandates pooled their investors' money together, and then placed the investment proceeds under Battoo's management. Certain of the mandates operated as pooled investment vehicles, where investors purchased investments in those mandates and the mandates in turn invested with Battoo.  When making their investments, many of the investors incurred irrevocable liability within the United States.  Battoo claimed to manage assets for at least 61 mandates.

25.     Examples of Battoo's mandates include The Planning Group, Sovereign International Asset Management, Inc. ("SIAM"), Maven Assurance Limited and Maven Life International Limited (collectively, "Maven" or "Maven Entities").

26.     The Planning Group is an Arizona-based investment adviser that was registered with the SEC until March 2013. The Planning Group's U.S.

clients invested more than $5 million in Battoo's PIWM investment program.

27.    At the time The Planning Group's clients made their investments, they were physically in the United States.  All investment decisions and directions were made from within the United States by The Planning Group's founder or its clients, all of whom were residents of the United States. The Planning Group's principal or its clients signed all documents relating to their investments while physically in the United States.  The Planning Group's clients also wired their PIWM investment proceeds from bank accounts in the United States directly to AIM's Bahamian bank account.

28.    SIAM is a Florida-based investment adviser that was registered with the SEC until February 2013. SIAM's clients invested more than $45 million with Battoo's PIWM investment program and the hedge funds he controlled.

29.    At the time SIAM's clients and their founder made their investments, they were physically in the United States.  All investment decisions and directions were made from within the United States by SIAM's principal or its clients.  SIAM's principal or its clients signed all documents relating to their investments while physically in the United States.  SIAM's U.S. clients wired their PIWM investment proceeds from bank accounts in the United States to a SIAM bank account in Florida, where SIAM pooled the funds before wiring them to AIM's Bahamian bank account or to a bank

account under Battoo's control in the Bailiwick of Guernsey, Channel Islands.

30.     The Maven Entities directed nearly $100 million to Battoo's PIWM investment program.  The Maven Entities were incorporated in Anguilla, but had no offices or employees there.  Maven's principal place of business was Illinois, where its management resided and worked. Randall Administration served as Maven's "administrator" and was located in Algonquin, Illinois.

31.     Maven sold insurance-linked investment products to U.S. investors. Maven investment products typically had a one-year term, which could be renewed by investors for additional one-year terms.  The investments expired after one-year if they were not renewed.

32.   Although Maven investors often signed their original investment paperwork outside the United States, at the time they renewed their investments, they were physically in the United States. To renew their investments for additional one-year terms, Maven's U.S. investors were required to send their new investment money to Randall Administration in Algonquin, Illinois.  Investors and Maven's representatives often signed the investment renewal paperwork in the United States.  Maven's U.S. investors typically paid their new investment funds by check, sending the checks from their residences or offices in the United States to Randall Administration, which maintains a bank account in Woodstock, Illinois.  The act of transmitting new

investment funds to Randall Administration automatically affected the renewal
of the investment for another one-year term.

## BATTOO'S FRAUD SCHEME IS BORN
## OUT OF THE FINANCIAL CRISIS

33.     Battoo attracted new investors and new investments from existing
investors by claiming to achieve exceptionally high risk-adjusted returns over an
extended period of time.  Even during the global financial crisis that began in
2008, Battoo trumpeted the success of his PIWM program.  Unfortunately for
investors, Battoo's PIWM program had suffered devastating losses in 2008 and
Battoo's subsequent representations about the supposed success of his
investments were all lies.

34.     In 2008, Battoo's asset management business experienced
significant losses from at least two events.  First, beginning in 2005, Battoo
participated in a fund-linked certificate program through an international bank,
wherein Battoo made leveraged investments in various investment funds using
credit extended by the bank. In total, Battoo invested approximately $130
million in fund-linked certificates through hedge funds he managed. These
investments were nearly wiped out in 2008.

35.     After an audit of Battoo's operations was completed in 2008, the
bank decided to terminate its relationship with Battoo and his BC Entities.  The
value of the investments subsequently plummeted. Battoo's losses on the fund-

linked certificates exceeded $100 million.

36.     Second, Battoo's asset management business suffered massive losses from its substantial exposure to Bernie Madoff's Ponzi scheme. In December 2008, several Battoo-managed hedge funds that were heavily invested in the Madoff Ponzi scheme lost a large portion of their value.

37.     The losses Battoo incurred in the fund-linked certificate investments and in the Madoff fraud flowed through to the PIWM portfolios in which U.S. investors had significant investments. Battoo had invested significant portions of PIWM investor funds in the Battoo-managed hedge funds with exposure to fund-linked certificates and Madoff.

## BATTOO HIDES THE TRUTH FROM
## INVESTORS AND PROSPECTIVE INVESTORS

38.     After settling litigation with the international bank that sponsored the fund-linked certificate program, Battoo only was able to recover approximately 15% of the amount invested. Investors lost approximately 85% of their investments – over $100 million. Battoo never informed PIWM investors about these losses.

39.     Battoo affirmatively lied to PIWM investors about their exposure to the Madoff fraud.  For example, Acadia Life International Limited ("Acadia Life"), another one of Battoo's mandates, had invested millions of dollars in

Battoo's PIWM program and was invested in Battoo-managed hedge funds that, in turn, were heavily invested with Madoff.

40.     On December 16, 2008, following Bernie Madoff's arrest for operating a massive Ponzi scheme, an employee of Acadia Life sent an email to Battoo inquiring about "the degree, if any, of your company's involvement with Mr. Madoff's investment company." Later that day, Battoo responded to the Acadia employee, who was based in the United States, that PIWM "will be issuing a letter by [the] end of [the] week to all clients to inform them that the current Madoff situation will have practically no impact on its portfolios." On the same day, Battoo sent an email to Maven's principal in Illinois stating that "the Madoff situation . . . will not have any major impact to PIWM or PIWM-I."

41.     A few days later Battoo's U.S.-based salesman sent a PIWM newsletter written by Battoo to U.S. investors, including Maven and Acadia Life, with this statement:

> Let's get straight to the point; PIWM did not have any **direct** investments with Madoff or any counterparty (broker or trading) exposure to Bernard L. Madoff Investment Securities LLC ("Madoff").
>
> PIWM did carry a small nominal percentage of approx (0.20% - 2.9%) portion of **indirect** exposure through a diversified hedge fund. Thus when accounted for, the impact will be less than (0.05% – 0.78%) depending on each client's custom-tailored portfolio which is very low and well under 1.0%. This shows why we focus on our diversified methodology across our multi-strategy and assets composites.

42.     Battoo's representations were false. Before the Madoff fraud became public, Acadia Life's and Maven's PIWM portfolios had significant investments in hedge funds that fed into the Madoff scheme, ranging from 10% to 24% in Acadia Life's PIWM portfolios, and about 19% for Maven's PIWM-I "Portfolio B."  As a result of Madoff's Ponzi scheme, these and other PIWM portfolios suffered significant losses. Battoo never disclosed such losses to Acadia Life, Maven, or to their investors who entrusted their funds to Battoo.

43.     Moreover, Maven's two biggest PIWM portfolios had more than 20% of their assets invested in Battoo hedge funds whose *sole* investments were in the bank's fund-linked certificates. Such exposure notwithstanding, Battoo never informed Maven about the losses stemming from the fund-linked certificates.

44.     Instead, Battoo began reporting bogus investment returns to PIWM investors and issuing false account statements that misrepresented the investors' holdings and the value of those holdings.

45.     Without knowledge of the substantial losses suffered by the portfolios as a result of the fund-linked certificate investments and with Battoo's assurances that their investments were profitable and unaffected by Madoff's Ponzi scheme, Maven and Acadia Life investors kept pouring more money into Battoo's PIWM investment program. Since 2009, Acadia Life and Maven investors have added tens of millions to their investments in PIWM.

## BATTOO MISAPPROPRIATES INVESTOR MONEY
## TO SUPPORT HIS EXTRAVAGANT LIFESTYLE

46.     In addition to the substantial investment losses resulting from the failed fund-linked certificate program and the Madoff Ponzi scheme, Battoo also stole money from his investors. He misappropriated at least $45 million of PIWM investor funds, which had been entrusted by investors to AIM as Battoo's custodian, to sustain his regal lifestyle. He spent approximately $3 million traveling the globe on private jets. He used $11 million of investor funds to renovate and furnish a 40,000 square-foot mansion in Switzerland. He paid more than $3 million to secure immigration status as a Swiss resident, and he gave another $1 million to his mother and girlfriend.

47.     Between July 2010 and December 2012, Battoo and BC Panama took $5 million from investor proceeds, which were on deposit with AIM, and gave it to AIM as a supposed "investment" in AIM.  At the time Battoo and BC Panama gave AIM $5 million of PIWM investor funds, AIM's accounts had multi-million dollar deficits and the cash infusion kept AIM solvent.

## BROWN AND AIM HELP BATTOO
## CARRY OUT HIS FRAUD ON INVESTORS

48.     Brown and AIM directly participated in, and substantially assisted, Battoo's massive fraud on investors.

49.     Throughout Battoo's fraud, Brown and AIM represented to

PIWM investors, their auditors, and other agents that AIM was the independent custodian for the PIWM investments. As custodian, AIM was supposed to receive and safeguard possession of the securities and other assets owned by investors in the PIWM program. PIWM investors routinely sent their new investment funds to accounts at AIM for investment with Battoo.

50.     The existence of an independent custodian to hold and verify investments is a critical safeguard against possible fraud and was an important fact to PIWM investors.  Contrary to Brown's and AIM's representations, however, since at least 2009 AIM did not have custody of most of the assets listed on the AIM account statements.

51.     In fact, after receiving investor proceeds in its Bahamian bank account, AIM did not retain custody of the money or use it to purchase investments for the benefit of PIWM investors.  Instead, at Battoo's direction, Brown caused AIM to transfer the money to Battoo's control, thereby facilitating Battoo's misappropriation of more than $45 million.  Brown and AIM transferred millions in investor assets to, among other places, Battoo, members of Battoo's family, and an interior design firm that renovated Battoo's 40,000-square-foot home in Switzerland.

52.     Another one of AIM's responsibilities as the alleged custodian for PIWM investments was to send account statements to investors' accountants for the purpose of verifying the securities held in investors' PIWM portfolios.

Each AIM account statement contained a list of hedge fund investments, as well as the value of the investment, supposedly held for the benefit of a PIWM investor.

53.     Brown and AIM assisted Battoo with his efforts to conceal the misappropriation as well as the crippling losses suffered by PIWM investors by sending account statements to PIWM investors' agents that materially overstated the value of assets held for PIWM investors.  In many cases, AIM's account statements even falsely represented that PIWM investors owned investments that did not exist.

54.     Because AIM did not have custody of the investments purportedly owned by PIWM investors, it could not prepare the account statements from its own information. To get around this problem, Brown and AIM relied on Battoo to provide the information for AIM's account statements. To make things really easy for Battoo, they provided Battoo with blank AIM letterhead so that he could create the account statements himself.

55.     For example, on February 15, 2010, one of Battoo's Florida-based sales agents sent an email to an AIM employee asking that AIM send "another batch" of its blank letterhead to Battoo's Fort Lauderdale, Florida address:

> When you get a chance please send me another batch of the AIM letterhead as you did last time (same amount, about 150, would be good). Send it to the address of record you have for Nik[olai Battoo], Galt Ocean [Drive, Fort Lauderdale, Florida].

Brown and AIM sent AIM's blank letterhead to Battoo's Florida residence.

56.     On September 17, 2010, in an email to AIM with the subject

"Letterhead," the same sales agent asked for more blank AIM letterhead

because it was being used up so quickly. In his email, the sales agent wrote:

"stuff runs like water . . . send some more along when you can."

Several weeks later, in October 2010, Battoo sent AIM a document that he

described as "AIM-PIWM (PIW) cash and custody statements 2009." The

"cash and custody statement" was prepared on AIM letterhead and purported

to list the cash and securities in one of the sub-accounts Battoo maintained at

AIM for an investor affiliated with The Planning Group in Arizona. The

securities listed included the usual core of hedge fund investments that the

investor never owned and managed accounts that likely did not exist.

57.     After receiving Battoo's sham account statements, Brown

distributed the documents to PIWM investors' accountants under letters

bearing his signature. In doing so, Brown and AIM did not disclose that the

information in the account statements was provided by Battoo or that Battoo

created the account statements himself. Because the account statements were

printed on AIM letterhead, it appeared to the recipients that AIM had custody

of the investments and verified their existence and value.

58.     Brown, as AIM's president, retained control and ultimate

authority over the approval and release of AIM account statements. He

managed the process, coordinated with Battoo, and ultimately issued the account statements to investors' representatives on behalf of AIM.

59.     Brown and AIM routinely provided bogus account statements to accounting firms retained by PIWM investors to audit their holdings. For example, Maven hired a U.S.-based accounting and consulting firm ("Maven's Auditor") to audit its financials for the years ending December 31, 2009 and December 31, 2010.

60.     In connection with those audits, Maven's Auditor requested that AIM confirm the PIWM investments held for the benefit of Maven's clients. In response, Brown and AIM sent Maven's Auditor PIWM account statements supposedly confirming the existence and value of assets held at AIM for the benefit of Maven investors. Brown and AIM sent the account statements to Maven's Auditor's offices in Arlington Heights, Illinois.

61.     All of the account statements Brown and AIM provided to Maven's Auditor were false, in that they overstated and otherwise misrepresented the assets supposedly held at AIM for the benefit of Maven's clients. For example, in May 2011, Brown and AIM sent Maven's Auditor an account statement that contained the following information:

BCCGI - PIWM-Insurance FBO Maven Assurance Ltd - (B)

| Weight | Description | Current Value |
|---|---|---|
| **Mutual Funds** | | |
| 3.9% | AltBlue Leveraged Fund Class A | 2,006,110.19 |
| 3.8% | Brevan Howard Fund Class A | 1,933,562.55 |
| 2.0% | FuturesOne Diversified Fund SPC Ltd Series A | 1,032,419.07 |
| 0.6% | FuturesOne Innovative Fund SPC Ltd Series O | 323,714.44 |
| 3.8% | GAM Emerging Markets Fund USD Shares | 1,940,379.97 |
| 3.6% | GAM Global Rates Fund USD Shares | 1,815,205.76 |
| 3.7% | GLC Gestalt Europe Fund Class A1 | 1,882,737.76 |
| 3.6% | JabCap Global Balanced Fund Class D1 | 1,828,240.07 |
| 4.5% | JabCap Global Convertible Fund Class D1 | 2,306,382.41 |
| 3.8% | LJM Offshore Fund Class I | 1,924,426.83 |
| 4.5% | Merchant Commodity Fund Class A1 | 2,289,629.26 |
| 4.7% | Parallax Offshore Investors Fund Class A | 2,401,302.59 |
| 4.1% | Paulson Advantage Class A | 2,079,986.02 |
| 4.0% | QM Multi-Strategy Fund Class B-2 | 2,030,875.25 |
| 4.9% | Quantitative Global (3X) Fund Class B-V | 2,512,104.60 |
| 6.3% | Quantitative Tactical Aggressive Class A-V | 3,231,058.12 |
| 3.9% | RG Niederhoffer Negative Correlation Class B | 1,971,239.86 |
| 4.0% | Simran Pre-Event Driven Activist Opportunity Fund | 2,032,207.18 |
| 4.7% | TT Financial Fund Class A | 2,381,343.63 |
| 4.0% | Whitebox Concentrated Convertible Arbitrage Class E | 2,059,240.00 |
| 78.4% | | 39,962,255.66 |
| | | |
| **Managed Accounts** | | |
| 3.1% | Alliance - PIWM I: Multi-Strategy Managed Futures & Commodities | 1,585,126.50 |
| 3.2% | Alliance - PIWM II: Multi-Strategy Equities & Options | 1,654,193.00 |
| 5.3% | Alliance - PIWM III: Global Diversified Macro Composite | 2,725,420.95 |
| 3.2% | Alliance - PIWM IV: Market Neutral & Multi-Style Arbitrage | 1,626,499.23 |
| 2.1% | Alliance - PIWM V: Multi-Strategy Credit & Income | 1,053,235.61 |
| 0.6% | Alliance - PIWM VI: Private Equity / Venture Capital (Ridgewood T) | 300,000.00 |
| 17.6% | | 8,947,475.59 |
| | | |
| **Cash and Money Funds** | | |
| 4.0% | Alliance USS Clearing | 2,051,846.84 |
| 4.0% | | |
| | | |
| 100.0% | | 50,961,578.09 |

62.     This AIM account statement is almost entirely a fiction.  At the time Brown and AIM sent this account statement to Maven's Auditor, Maven investors had no interest in at least 18 of the 20 "mutual funds" listed in the account statement. Although the "managed accounts" purport to be accounts at AIM (*i.e.*, "Alliance"), AIM has no record of any such accounts.

63.     Brown and AIM sent the account statements by mail to Maven's Auditor's office in Illinois.

64.     In another example, in 2010 a Dutch affiliate of a large U.S.-based accounting firm ("Dutch Affiliate") hired by an institutional PIWM investor attempted to confirm the existence and value of the investor's holdings. In connection with the asset verification process, Dutch Affiliate requested that

AIM provide copies of the investor's PIWM account statements. As with the account statements sent to Maven's Auditor, the account statements Brown and AIM sent to Dutch Affiliate materially misrepresented the value and existence of the actual investments held by the financial institution.

65.     After receiving AIM's account statements, in February 2011, Dutch Affiliate sent a letter to Brown and AIM requesting information regarding AIM's custody and allocation of PIWM assets held for the benefit of its client; how AIM valued the managed accounts listed on PIWM account statements; and the independence of AIM.

66.     Brown sent Battoo a draft response letter for his review and approval. Battoo made revisions to the letter, which Brown mostly accepted and incorporated in the final response letter sent to Dutch Affiliate. On behalf of AIM, Brown's response letter to Dutch Affiliate made the following representations:

- "[AIM] acts as custodian and its responsibility is to report on the assets held by its clients based on the most recent market information for securities held."

- "Managed accounts are valued based on the performance of the assets within the underlying portfolio."

- "[AIM] is independent of all its clients and Advisors. Duties are clearly segregated as required regulations there exist no over lapping (sic) of personnel or responsibilities as it relates to the operation of any client relationship. The mandate of [AIM] as custodian is independent, separate and distinct to that of BC Capital Group S.A. who is responsible for the Management and

Allocation of client assets."

67.     Brown's statements to Dutch Affiliate were materially false and misleading. AIM did not act as a true custodian for Battoo and his entities, as AIM lacked custody of the hedge fund investments. The managed accounts referred to by Brown did not exist. And AIM was not independent of BC Panama: AIM and BC Panama shared office space, a phone and fax number, and personnel; AIM received substantial financial support from Battoo and BC Panama (from investor funds, no less); and AIM worked in concert with Battoo and his entities to provide false account statements to investors and others.

68.     At the time Brown and AIM sent the fraudulent PIWM account statements to Maven Auditor and Dutch Affiliate and represented that they were acting as custodian for PIWM investments, they knew the information they were providing was false and misleading. They also knew that the accuracy of the information was important to Maven Auditor and Dutch Affiliate because they were using the information provided by Brown and AIM to perform audits on behalf of their respective clients. They also knew that the false and misleading information provided to the firms would be transmitted to their respective clients, who would and did rely upon the accuracy of the information provided by Brown and AIM.

69.     Brown and AIM also sent bogus PIWM account statements to two firms that regularly prepared asset verifications for numerous PIWM investors

("verification firms") looking for independent reassurance regarding the legitimacy of Battoo's PIWM investment program. Brown and AIM sometimes referred to the account statements they sent to support third party asset verifications as "portfolio custodial statements." These documents were essentially identical in form and substance to the account statements sent to the auditors.

70.     Each year, from 2008 until at least 2011, Brown and AIM provided dozens of falsified portfolio custodial statements to the two verification firms. Like the account statements provided to the auditors, the portfolio custodial statements included a core of hedge fund investments that the particular PIWM investors either never owned, or owned in a far lower quantity than shown on the account statements.

71.     For example, for the year ended December 31, 2009, the two verification firms issued more than 25 asset verifications for PIWM portfolios managed by the Battoo Entities. In the aggregate, the 2009 asset verifications, which were based on fraudulent AIM account statements, overstated the value of assets held in the AIM accounts by approximately $148.9 million. The two verification firms based their asset verifications on the false portfolio custodial statements provided by Brown and AIM.

72.     In addition to the phony portfolio custodial statements, Brown sent emails to the two verification firms falsely representing that AIM had

custody of the PIWM investments. For example, in February 2009, Brown responded to one firm's inquiry for information regarding several of the hedge fund investments listed on AIM's portfolio custodial statements for Maven. In his email response, Brown stated that AIM was providing "custody services" for the shares invested with Battoo. The statement was false because AIM did not have custody of the shares purchased for the benefit of Maven investors.

73.     In September 2011, one of the verification firms was completing asset verifications for the year ended December 31, 2010 and sent Brown an email with several questions concerning the hedge fund holdings listed on AIM's portfolio custodial statements. Brown sent an email to Battoo requesting "guidance" on how to respond to the questions.

74.     In response, Battoo provided Brown with specific information regarding the share classes of the hedge fund investments. Brown incorporated Battoo's comments into an email he sent to the verification firm that, among other things, represented that AIM had custody of those investments. Brown's representation was false because AIM did not have custody of the investments.

75.     Brown and AIM knew, or acted recklessly in not knowing, that the portfolio custodial statements were false. They knew they did not have custody of the investments listed in those statements and, at a minimum, knew that they could not properly verify the accuracy of the information in those statements.

76.     Brown and AIM also had information directly contradicting the

account holdings information being provided by Battoo. For example, as the custodian of record for Battoo's hedge fund investments with Madoff exposure, Brown and AIM received multiple notifications of suspension of redemptions relating to the Madoff investments. Yet around the same time Brown and AIM received these notices, Battoo changed the account holdings information to remove those hedge funds from the list of PIWM investor portfolio holdings and reported strong performance in PIWM accounts. Since Brown and AIM were supposedly acting as custodian of those hedge fund investments, any sales of those interests should have required direction from Battoo or PIWM investors to AIM to redeem those hedge fund shares. Brown and AIM never received such directions.

77.    Brown and AIM knew, or acted recklessly in not knowing, that: (a) the portfolio custodial statements were being used by the two verification firms to verify the PIWM investments supposedly held at AIM; (b) the information in the portfolio custodial statements was being transmitted by the verification firms to PIWM investors, including investors in the United States; and (c) the verification firms and PIWM investors were relying on the accuracy of the information provided by Brown and AIM, including the representations that AIM had custody of the PIWM investments.

78.    One result that flowed directly from Brown's and AIM's false and misleading representations was that PIWM investors continued to purchase

additional securities through Battoo's PIWM investment program. For example, since 2011, Maven investors made more than $13 million in new investments after receiving fraudulent AIM account statements, as well as audited financial statements and asset verifications that were based on fraudulent AIM account statements. It was very important to PIWM investors' investment decisions that AIM was in place as an independent custodian and could provide verification of their assets.

## BROWN AND AIM PROFITED
## FROM THEIR MISCONDUCT

79.     In addition to the $5 million Battoo misappropriated from investors and transferred to AIM as an "investment," Brown and AIM profited by their misconduct through increased fees and commissions. Using PIWM investor funds, Battoo paid Brown and AIM more than $290,000 in fees and commissions since 2009.

80.     Under their agreements with Battoo, Brown's and AIM's fees and commissions were to be based, at least in part, on a percentage of the total assets under management. By sending out fraudulent account and custodial statements that overstated and misrepresented the value and existence of current PIWM investments, Brown and AIM helped Battoo continue his fraud scheme and attract new investments into it. As more and more investment money flowed into AIM's bank account, Brown and AIM continued to collect

fees from Battoo.

## COUNT I
## VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT

81.     Paragraphs 1 through 80 are realleged and incorporated by reference as though fully set forth herein.

82.     By engaging in the conduct described above, defendants Julian R. Brown and Alliance Investment Management Limited, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

83.     Defendants knowingly or recklessly engaged in the conduct described above.

84.     By reason of the foregoing, defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II
## VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT

85.     Paragraphs 1 through 80 are realleged and incorporated by reference as though fully set forth herein.

86.     By engaging in the conduct described above, defendants Julian R. Brown and Alliance Investment Management Limited, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or

indirectly, have obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Defendants knowingly, recklessly, or negligently engaged in the conduct described above.

88.     By reason of the foregoing, defendants violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III
## VIOLATIONS OF SECTION 17(a)(3) OF THE SECURITIES ACT

89.     Paragraphs 1 through 80 are realleged and incorporated by reference as though fully set forth herein.

90.     By engaging in the conduct described above, defendants Julian R. Brown and Alliance Investment Management Limited, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

91.     Defendants knowingly, recklessly, or negligently engaged in the conduct described above.

92.     By reason of the foregoing, defendants violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**COUNT IV**
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT,**
**AND EXCHANGE ACT RULE 10b-5**

93.     Paragraphs 1 through 80 are realleged and incorporated by reference.

94.     By engaging in the conduct described above, defendants Julian R. Brown and Alliance Investment Management Limited, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly and indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons, including purchasers and sellers and prospective purchasers and sellers of securities.

95.     Defendants knowingly or recklessly engaged in the conduct described above.

96.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder.

## COUNT V
## AIDING AND ABETTING VIOLATIONS OF THE SECURITIES ACT, THE EXCHANGE ACT, AND THE ADVISERS ACT

97.     Paragraphs 1 through 80 are realleged and incorporated by reference.

98.     At all times alleged herein, Battoo, BC Panama and BC Hong Kong were acting as investment advisers, and were engaging in the business of advising pooled investment vehicles as to the value of securities and as to the advisability of investing in, purchasing or selling securities.

99.     By the conduct alleged above, Battoo, BC Panama and BC Hong Kong violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder, and Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 CFR 275.206(4)-8] thereunder.

100.    By their conduct alleged above, defendants knowingly or recklessly provided substantial assistance to Battoo, BC Panama and BC Hong Kong in connection with their direct violations of the federal securities laws.

101.    By reason of the foregoing, defendants aided and abetted Battoo's, BC Panama's and BC Hong Kong's direct violations of the federal securities laws alleged above.

102.    Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], and Section

209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], defendants Julian R. Brown and Alliance Investment Management Limited are deemed to be in violation of the above-stated provisions to the same extent as Battoo, BC Panama and BC Hong Kong.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff U.S. Securities and Exchange Commission demands a trial by jury for all issues so triable.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

## I.

Issue findings of fact and conclusions of law that defendants Julian R. Brown and Alliance Investment Management Limited committed the violations charged and alleged herein.

## II.

Enter an Order of Permanent Injunction restraining and enjoining defendants Julian R. Brown and Alliance Investment Management Limited, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described

above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Exchange Act Rule 10b-5 [17 CFR 240.10b-5] thereunder.

### III.

Enter an Order of Permanent Injunction restraining and enjoining defendants Julian R. Brown and Alliance Investment Management Limited, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of or in aiding and abetting violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Advisers Act Rule 206(4)-8 [17 CFR 275.206(4)-8].

### IV.

Enter an Order requiring defendants Julian R. Brown and Alliance Investment Management Limited to disgorge the ill-gotten gains received as a result of the violations alleged herein, including prejudgment interest.

### V.

Enter an Order imposing upon defendants Julian R. Brown and Alliance Investment Management Limited appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act
[15 U.S.C. § 80b-9(e)].

## VI.

Enter an order requiring defendants Julian R. Brown and Alliance
Investment Management Limited to provide the Commission with an
accounting of all of the funds received, directly or indirectly, from Battoo, any
entities affiliated with Battoo, or any of Battoo's investors, including: (1) the
date each amount was received, the source, the reason for receipt of the funds,
and the account into which such amount was deposited; (2) the uses to which
such funds were put, including, but not limited to, the nature and purpose of the
use of the funds, the date and amount of the disbursement, and the name of the
individual or entity involved in the transaction; and (3) amounts of any
remaining funds and their location.

## VII.

Enter an order requiring defendants Julian R. Brown and Alliance
Investment Management Limited to repatriate any funds, assets, accounts, or
other property obtained or maintained with investor funds or with funds
obtained from Battoo or his affiliated entities, or into which investor funds or
funds obtained from Battoo or his affiliated entities have been deposited, that
are not subject to the jurisdiction of the Court, and requiring defendants to
direct the deposit of any such funds into identified accounts in the United

States, pending conclusion of this matter.

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other relief as this Court deems appropriate.

Dated: August 8, 2014

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: _/s/ Daniel J. Hayes_

Daniel J. Hayes
John D. Mitchell
**U.S. SECURITIES AND
 EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390