UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JULIAN R. BROWN AND ALLIANCE INVESTMENT MANAGEMENT LIMITED,<br><br>Defendants. | No. 14 C 6130<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

The United States Securities and Exchange Commission ("SEC") has sued defendants Julian R. Brown and Alliance Investment Management Limited ("AIM") for violating federal securities laws. The defendants have moved to dismiss the SEC's complaint for lack of personal jurisdiction and failure to state a claim for relief. They argue that their contacts with the United States are too sporadic to support personal jurisdiction. They also argue that the SEC has failed to allege a domestic securities transaction, which they argue is a necessary element of a claim under the federal securities laws. For the following reasons, the Court denies the defendants' motion.

**Background**

AIM is a Bahamian broker-dealer registered with the Securities Commission of the Bahamas. R. 1 ¶ 15. Brown, a resident of the Bahamas, is AIM's president and director. *Id.* at ¶ 16. The SEC alleges the defendants participated in a

"massive international fraud scheme orchestrated primarily by asset manager Nikolai S. Battoo and entities under his control." *Id.* at ¶ 1.[1] AIM held itself out as the custodian of assets related to Battoo's "asset management program," which operated under the trade name "Private International Wealth Management" ("PIWM"). *Id.* at ¶ 15. Investors participated in the PIWM program by investing in individual "mandates" managed by Battoo. *Id.* at ¶ 24. Of the 61 such mandates, three are relevant to the defendants' motion: The Planning Group ("TPG"), Sovereign International Asset Management, Inc. ("SIAM"), and Maven Assurance Limited and Maven Life International Limited (collectively, "Maven"). *Id.* at ¶ 25. Clients of TPG, an Arizona-based investment adviser, invested more than $5 million in the PIWM program. *Id.* at ¶ 26. The SEC contends that TPG's clients invested in PIWM in the United States, citing the following allegations:

> At the time [TPG]'s clients made their investments, they were physically in the United States. All investment decisions and directions were made from within the United States by [TPG]'s founder or its clients, all of whom were residents of the United States. [TPG]'s principal or its clients signed all documents relating to their investments while physically in the United States. [TPG]'s clients also wired their PIWM investment proceeds from bank accounts in the United States directly to AIM's Bahamian bank account

*Id.* at ¶ 27. The SEC makes similar allegations with respect to SIAM (a Florida-based investment adviser) and Maven (Anguilla-incorporated entities with principal places of business in Illinois). *Id.* at ¶¶ 28, 30. SIAM's clients invested more than

---

[1] Those entities included BC Capital Group, S.A. ("BC Panama") and BC Capital Group Limited ("BC Hong Kong"). R. 1 ¶¶ 19-20. In 2012, the SEC and the Commodity Futures Trading Commission ("CFTC") filed civil enforcement actions in this district against Battoo, BC Panama, and BC Hong Kong. *Id.* at ¶¶ 17-21. Judge Chang, who is presiding over both actions, has entered orders of default against those defendants. *See CFTC v. Battoo et al.*, No. 12 C 7127 (N.D. Ill.) (Chang, J.) (R. 209); *SEC v. Battoo*, No. 12 C 7125 (N.D. Ill.) (Chang, J.) (R. 105).

$45 million in the PIWM program. *Id.* at ¶ 28. Those clients signed all documents related to their investments in the United States, and wired investment proceeds from their bank accounts in the United States to SIAM's bank account in Florida. *Id.* at ¶ 29. SIAM then pooled the funds before wiring them to AIM's bank account or to a bank account under Battoo's control in Bailiwick of Guernsey, Channel Islands. *Id.* Unlike TPG and SIAM, Maven's investors "often signed their original investment paperwork outside the United States . . . ." *Id.* at ¶ 31. Those investments "typically" had one-year terms. *Id.* In order to renew their investments for additional terms, Maven's investors executed renewal paperwork — "often" in the United States — and sent new investment money to Illinois-based Randall Administration (Maven's "administrator"). *Id.* at ¶¶ 30, 32. The act of transmitting their new investment funds to Randall Administration automatically renewed their investment for another one-year term. *Id.* at ¶ 32.

Battoo's PIWM program suffered "devastating" losses in connection with the 2008 financial crisis and the collapse of Bernie Madoff's Ponzi scheme. *Id.* at ¶¶ 33, 36. To cover up those losses, Battoo began reporting bogus investment returns misrepresenting the value of investors' holdings. *Id.* at ¶ 44. Brown and AIM participated in Battoo's fraud by holding AIM out to investors as an "independent custodian" for their PIWM investments. *Id.* at ¶ 49. The SEC alleges that, on the contrary, since at least 2009 AIM did not possess or control most of the assets listed in AIM's account statements. *Id.* at ¶ 50. The statements overstated the value of some holdings, and fabricated others. *Id.* at ¶ 53. AIM also transferred some assets

to Battoo, which he used to support his lavish lifestyle. *Id.* at ¶ 51. The defendants relied on Battoo to supply the information that AIM was supposed to be independently verifying. *Id.* at ¶ 54. They helped Battoo perpetrate this fraud by sending blank AIM letterhead to Battoo at his Fort Lauderdale, Florida address. *Id.* at ¶¶ 55-56. Battoo used the letterhead to prepare sham account statements, which he then sent to Brown. *Id.* at ¶¶ 56-57. Brown, in turn, sent cover letters bearing his signature to PIWM investors' accountants enclosing the false statements. *Id.* at ¶ 57. The SEC highlights in particular AIM's interactions with Maven's U.S.-based accounting firm in connection with that firm's audit of Maven's 2010 financials. *Id.* at ¶¶ 59-60. In response to the auditor's requests concerning Maven's PIWM investments, Battoo told AIM to send account statements to the auditor's offices in Arlington, Heights, Illinois. *Id.* at ¶ 60; *see also* R. 16 at 25 ¶ 15 (Brown states in his declaration that AIM sent the account statements to the auditors pursuant to Battoo's instructions.).[2] Those statements were false. *Id.* at ¶¶ 61-62. In one statement, the defendants list 20 "mutual funds" in which Maven purportedly held almost $40 million. *Id.* The SEC alleges that Maven's investors held no interests in at least 18 of the 20 funds. *Id.* at ¶ 62. It lists six AIM accounts holding approximately $10 million. *Id.* at ¶ 61. AIM has no record of any such accounts. *Id.* at ¶ 62.

The SEC has filed a five-count complaint against Brown and AIM for violating the Securities Act of 1933 (the "'33 Act") (Counts I-III), the Exchange Act

---

[2] The Court may consider Brown's declaration in connection with the defendants' Rule 12(b)(2) motion. *See infra*.

of 1934 (the "'34 Act") (Count IV), and for aiding and abetting Battoo's violations of the '33 Act, the '34 Act, and § 206(4) of the Investment Advisers Act (Count V). Brown and AIM have moved to dismiss the SEC's complaint pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6).

## Legal Standard

It is the SEC's burden to establish that the defendants are subject to this Court's personal jurisdiction. *Northern Grain Marketing, LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). To determine whether the SEC has satisfied its burden, the Court may "receive and weigh" affidavits and other evidence outside the pleadings. *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation and internal quotation marks omitted). The SEC "need only make out a *prima facie* case of personal jurisdiction" because the Court has not held an evidentiary hearing to resolve factual disputes. *Id.* (citation and internal quotation marks omitted). The Court construes the SEC's complaint "liberally with every inference drawn" in its favor. *GCIU-Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). The Court, however, accepts as true the facts as stated in Brown's unrefuted declaration. *See Purdue Research Foundation*, 338 F.3d at 782-83 ("[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction."); *see also GCIU-Employer Retirement Fund*, 565 F.3d at 1020 n.1

("[W]e accept as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff.").

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "Whether a complaint states a claim upon which relief may be granted depends upon the context of the case and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court accepts the complaint's well-pleaded allegations as true and construes them in the light most favorable to the SEC. *Id*

## Analysis

**I.  Whether the Court Has Personal Jurisdiction Over the Defendants**

In federal question cases, *see* R. 1 ¶ 12, "a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). In this case, the '33 Act and the '34 Act authorize worldwide service of process. *See* 15 U.S.C. § 77v(a) (process may be served "wherever the defendant may be found"); 15 U.S.C. § 78aa (same); *Robinson Engineering Co. Pension Plan and Trust v. George*, 223 F.3d 445, 449 (7th Cir.

2000) (construing the '33 Act and the '34 Act to authorize worldwide service). As it would in a diversity case, the Court will apply the familiar "minimum contacts" test to determine whether exercising jurisdiction over the defendants comports with due process. *See Mobile Anesthesiologists Chicago*, 623 F.3d at 443-44; *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (The court may exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'") (*quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The relevant contacts, however, are with the United States as a whole, rather than a particular state. *See Waeltz v. Delta Pilots Retirement Plan*, 301 F.3d 804, 807 n.3 (7th Cir. 2002). The defendants incorrectly assumed that their contacts with Illinois were dispositive and tailored Brown's affidavit accordingly. *See* R. 16 at 5-6, 9-11; *see also id.* at 24 ¶ 7 ("AIM and I did not and do not conduct any business in the State of Illinois."). So, they have not rebutted many of the complaint's allegations regarding their contacts with the United States.[3]

The defendants may be subject to "general jurisdiction" and/or "specific jurisdiction" depending on the extent of their contacts with the United States. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball*, 751 F.3d 796, 800 (7th Cir. 2014). "General jurisdiction is proper only in the limited number of fora in

---

[3] Brown does state that AIM does not have an office, and that he does not reside, "anywhere in the United States." *See* R. 16 at 23-24 ¶¶ 3-4. While the Court accepts these statements as true, the SEC's jurisdictional arguments are not based upon the defendants' physical presence in the United States.

which the defendant can be said to be 'at home.'" *Id.* (quoting *Daimler AG v. Bauman*, 134 S.Ct. 746, 751 (2014)); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011) (General jurisdiction over foreign corporations is proper if its contacts "are so 'continuous and systematic' as to render them essentially at home in [the forum].") (quoting *Int'l Shoe*, 326 U.S. at 317). As far as the complaint reveals, the defendants' contacts with the United States are too sporadic to support general jurisdiction. They accepted wire transfers from Battoo's U.S.-based "mandates." *See* R. 1 ¶¶ 24, 27, 29. They sent account statements to PIWM investors in the United States, (*see id.* at ¶ 57), and on at least two occasions sent AIM letterhead to Battoo in Florida. *See id.* at ¶¶ 55-56. In its response to the defendants' motion, the SEC cites AIM's website, which states that the company provides financial services "throughout the United States, Canada and internationally." R. 22 at 12. These contacts, taken together, indicate only that AIM solicits and conducts *some* business in the United States. This is insufficient to satisfy the demanding standard for general jurisdiction.

The SEC has, however, made a *prima facie* case of specific jurisdiction. "Specific jurisdiction is available for a suit that arises out of the forum-related activity." *Advanced Tactical*, 751 F.3d at 800. The SEC alleges that PIWM's U.S. investors wired investment funds directly into AIM's bank account in the Bahamas. R. 1 ¶¶ 27, 29, 49. AIM and Brown led investors to believe that AIM operated as an independent custodian for those investments. *Id.* at ¶¶ 25-32, 49. In fact, according to the complaint, the defendants worked in concert with Battoo to

misstate the value of those investments. AIM sent blank letterhead to Battoo in Florida so that he could prepare bogus account statements. *Id.* ¶¶ 55-56. After Battoo returned the completed statements to AIM, it distributed the false statements to investors in the United States under letters bearing Brown's signature. *Id.* at ¶¶ 57-59. As one example of this scheme, the SEC alleges that Brown and AIM sent false account statements to Maven's auditor in Illinois. *Id.* at ¶ 60. The SEC's securities fraud claims "arise out of" these contacts.

The defendants argue that their contacts with Illinois were random and fortuitous, not purposeful, because they sent statements to Maven's auditors at Battoo's request. R. 16 at 16. In cases alleging intentional torts, it is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff." *Walden v. Fiore*, 134 S.Ct. 1115, 1123 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Instead, the defendant's conduct must be "expressly aimed" at the forum. *See Felland v. Clifton*, 682 F.3d 665, 674-76 (7th Cir. 2012) (tortious conduct "expressly aimed" at the forum establishes personal jurisdiction). Brown states in his declaration that Battoo's request was atypical: "[i]t is not AIM's policy to send account statements *other than to AIM's clients*." *Id.* at 25 ¶ 15 (emphasis added). This statement is consistent with the SEC's allegation that the defendants deliberately sent false account statements to U.S. investors under AIM's letterhead. According to Brown, it was only the direct contact with Maven's auditors that was "random" or "fortuitous," not the defendants' contact with the United States. Also, the

complaint's allegations belie the defendants' assertion that Battoo acted "unilaterally." The SEC alleges — and Brown does not refute — that "Brown, as AIM's president, retained control and ultimate authority over the approval and release of AIM account statements. He managed the process, coordinated with Battoo, and ultimately issued the account statements to investors' representatives on behalf of AIM." R. 1 ¶ 58. In February 2010, AIM complied with a request from Battoo's Florida-based sales agent for "another batch of the AIM letterhead . . . (same amount, about 150, would be good)." *Id.* at ¶ 55. The same agent sent another request for letterhead in September 2010 because the "stuff runs like water . . . ." *Id.* at ¶ 56. Battoo used the letterhead to prepare false account statements, which he then sent to the defendants so that they could send them to PIWM investors (including investors in the United States). *Id.* at ¶¶ 56-57. The SEC further alleges that the defendants sent false "portfolio custodial statements" to two "verification firms" knowing that the firms would forward that information to U.S. investors. *Id.* at ¶ 77; *see Calder v. Jones*, 465 U.S. 783, 789 (1984) (rejecting defendants' argument that they had no contacts with California because their employer was responsible for distributing their libelous article in that state). The defendants aimed their allegedly tortious conduct at investors in the United States, who continued to invest in PIWM mandates not realizing that the program was losing money. *Id.* at ¶ 78 (alleging that Maven investors "made more than $13 million in new investments after receiving fraudulent AIM account statements, as well as audited financial statements and asset verifications that were based on

fraudulent AIM account statements").[4] It was foreseeable, then, that the defendants might be required to defend the accuracy of the account statements in a U.S. court. These contacts are sufficient to support specific personal jurisdiction.

## II. Whether the SEC's Complaint States a Claim for Relief

The defendants also argue that the complaint fails to state a securities fraud claim because it does not allege a domestic securities transaction. Prior to the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), courts held that the securities laws conferred subject-matter jurisdiction over some extraterritorial transactions. Many courts adopted some version of the Second Circuit's "conduct and effects" test to determine whether they had jurisdiction in particular cases. *Id.* at 257. Courts applying that test exercised jurisdiction over extraterritorial transactions if: (1) "the wrongful conduct occurred in the United States," and/or (2) "the wrongful conduct had a substantial effect in the United States or upon United States citizens." *Id.* (quoting *SEC v. Berger*, 322

---

[4] The only case that the defendants analyze in any detail is *Caghan v. Caghan*, No. 1–11–1508, 2012 WL 6955683 (Ill. App. Ct. Sept. 13, 2012), a non-precedential decision from an Illinois appellate court. *See* R. 16 at 10-11. In *Caghan*, Ohio was the focal point of the defendants' alleged decades-long scheme to conceal family assets from the plaintiff. *See Caghan*, 2012 WL 6955683, *1, 8. The plaintiff alleged only two relevant contacts with Illinois — a mailing containing allegedly false financial information and a conversation between the plaintiff and one of the defendants — separated by three years. *Id.* at *5. In the context of the alleged scheme as a whole, the court concluded that these two contacts were too attenuated to support personal jurisdiction. "[B]ased on plaintiff's claim of a long-standing fraud scheme involving Ohio property, an Ohio business, and an Ohio trust and estate, we find that the two specific instances of defendants' limited contacts with Illinois do not satisfy the federal due process requirement of minimum contacts." *Id.* at *8. *Caghan* is distinguishable. The defendants' alleged contacts with the United States are not peripheral to a fraud "aimed" somewhere else. Viewing the evidence in the light most favorable to the SEC, U.S. investors were targets of the defendants' scheme and the false account statements that AIM sent to those investors were an important instrument of the fraud. *See* R. 1 ¶ 78 ("It was very important to PIWM investors' investment decisions that AIM was in place as an independent custodian and could provide verification of their assets.").

F.3d 187, 192–193 (2d Cir. 2003) (*overruled by Morrison*, 561 U.S. at 273)); *see also Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 663 (7th Cir. 1998) (*overruled by Morrison*, 561 U.S. at 273) ("[F]ederal courts have jurisdiction over an alleged violation of the antifraud provisions of the securities laws when the conduct occurring in the United States directly causes the plaintiff's alleged loss in that the conduct forms a substantial part of the alleged fraud and is material to its success."). The *Morrison* Court held that whether the securities laws apply to foreign transactions is a question that goes to the merits of the plaintiff's fraud claim, not a federal court's subject-matter jurisdiction to hear it. *See Morrison*, 561 U.S. at 254. Moreover, the tests that lower courts had devised to decide that question improperly presumed the statutes' extraterritorial reach. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 255 (citation and internal quotation marks omitted). The '34 Act was silent with respect to its application to extraterritorial transactions, *see id.* at 255, 262, and its substantive provisions focused on "purchases and sales of securities *in the United States*." *Id.* at 266 (emphasis added); *see also id.* at 268 ("The same focus on domestic transactions is evident in [the '33 Act], enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading."). The Supreme Court held that the '34 Act — and by implication, the '33 Act — do not apply to foreign transactions. *Id.* at 265 ("[T]here is no affirmative indication in the Exchange Act that § 10(b) applies

extraterritorially, and we therefore conclude that it does not."). In doing so, it replaced the lower courts' "conduct and effects" test with a "transactional" test: the securities laws apply when "the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 270.

The parties dispute whether the Dodd-Frank Act, which Congress passed shortly after the Supreme Court decided *Morrison*, affirmatively indicates that the securities laws apply to foreign transactions. Section 929P of the Dodd-Frank Act added the following language to the '33 Act and the '34 Act:

> Extraterritorial jurisdiction
>
> The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of the antifraud provisions of this chapter involving--
>
> (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
>
> (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 78aa; *see also* 15 U.S.C. § 77v. According to the SEC, this language reinstates the pre-*Morrison* "conduct and effects" test. R. 22 at 12-17. However, as the court observed in *SEC v. A Chicago Convention Ctr., LLC*, 961 F.Supp.2d 905 (N.D. Ill. 2013), construing the Dodd-Frank Act to supersede *Morrison* may be problematic. The new language refers specifically to the "jurisdiction" of district courts and appears in the sections of the '33 Act and the '34 Act entitled "Jurisdiction of offenses and suits." *Id.* at 911; *see also* 15 U.S.C. § 78aa; 15 U.S.C. §

77v.  On one reading of the new language, the Dodd-Frank Act merely confirmed the power of district courts to hear securities-law claims without clearly expressing Congress's intent to apply the statutes to foreign transactions.  *Id.* at 911-12.  The *Chicago Convention Center* court thoroughly analyzed Section 929P's language and the Act's legislative history before concluding that it was unnecessary to resolve "this complex interpretation issue."  *Id.* at 916.  Under either the transactional test, or the conduct and effects test, the SEC had stated a claim for relief.  *Id.* at 917-18.  In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2nd Cir. 2012), the Second Circuit held that a sale is made in the United States when: (1) "the parties incur irrevocable liability to carry out the transaction within the United States" or (2) "when title is passed within the United States."  *Id.* at 69; *see also Chi. Convention Ctr.*, 961 F.Supp.2d at 917.  The SEC argued in *Chicago Convention Center* that the parties became "irrevocably liable" when the defendant's managing member accepted a foreign investor's subscription in the United States.  *Chi. Convention Ctr.*, 961 F.Supp.2d at 918.  The defendants argued that the "offer and acceptance — the requisite meeting of the minds — occurred abroad."  *Id.*  The court declined to resolve the parties' factual dispute at the pleadings stage.  *Id.* ("The parties' disagreement highlights factual disputes in the case—whether irrevocable liability attached and if so, where it attached—which the Court cannot resolve at this stage.").

This Court, consistent with *Chicago Convention Center*, concludes that it is unnecessary to resolve at this time the difficult question of the Dodd-Frank Act's

impact on *Morrison*. The SEC alleges that the parties incurred irrevocable liability in the United States. *See* R. 1 ¶¶ 24, 27, 29. With respect to TPG and SIAM, the SEC alleges that the parties incurred irrevocable liability when those entities (or their clients) executed transaction documents in the United States and wired funds from their U.S. bank accounts to bank accounts in the Bahamas and the Channel Islands. *Id.* ¶¶ 27-29. With respect to Maven, the SEC concedes that investors often executed their original investment paperwork outside the United States. *Id.* at ¶ 32. But they renewed their investments for additional one-year terms by executing renewal documents in the United States and sending checks to Randall Administration in Illinois. *Id.* So, according to the SEC, Maven's investors reinvested in the United States. The defendants argue, by contrast, that all PIWM sales occurred abroad when Battoo executed "Subscription Agreements" or "Allocations." *See* R. 16 at 19 ("The SEC neglects to allege, however, that the purchase actually took place outside the United States when the Subscription Agreement or Allocation was accepted by the Battoo entities."); R. 26 at 18 ("Securities transactions were not effectuated until Mr. Battoo executed the subscription Agreement abroad."). The "Subscription Agreement" and the "Allocation" are not in the record, nor is there any evidence of the circumstances surrounding the parties' execution of these documents. The parties will have to develop these factual issues in discovery. *See Chi. Convention Ctr.*, 961 F.Supp.2d at 918; *see also In re Optimal U.S. Litig.*, 813 F.Supp.2d 351, 373 (S.D.N.Y. 2011) (similar); *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 405 (S.D.N.Y.

2010) (similar). Construing the complaint in the light most favorable to the SEC, it has stated a claim for relief.

## Conclusion

For the foregoing reasons, the Court denies the defendants' motion to dismiss, R. 16. The Court sets a status hearing for March 9, 2015 at 9:00 a.m.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: March 4, 2015