# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES ) <br> TRADING COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NIKOLAI SIMON BATTOO; BC CAPITAL ) <br> GROUP S.A.; BC CAPITAL GROUP ) <br> INTERNATIONAL LIMITED a/k/a BC ) <br> CAPITAL GROUP LIMITED a/k/a BC ) <br> CAPITAL GROUP GLOBAL; BC CAPITAL ) <br> MANAGEMENT LLP; AND BC CAPITAL ) <br> GROUP HOLDINGS S.A., ) <br> ) <br> Defendants. ) <br> ) | Case No. 1:12-cv-07127 <br><br> Hon. Edmond E. Chang |

PRELIMINARY INJUNCTION

Plaintiff United States Commodity Futures Trading Commission has filed a
Complaint for Permanent Injunction, Civil Monetary Penalties, and Other
Equitable Relief and moved for a preliminary injunction in the above-captioned
proceeding. The Court has considered the pleadings (including the exhibits,
declarations, and attachments), and memorandum in support of the Commission's
*Ex Parte* Motion for Statutory Restraining Order, Asset Freeze, Preliminary
Injunction, Expedited Discovery, Appointment of Receiver, and Other Equitable
Relief, among other relevant materials on file (including prior submissions in
support of the initial TRO and the renewal TRO). There is good cause to believe
that Defendants BC Capital Group S.A. ("BC Panama"), BC Capital Group

International Limited (a/k/a BC Capital Group Limited; a/k/a BC Capital Group Global) ("BC Hong Kong"), BC Capital Management LLP ("BC London"), BC Capital Group Holdings S.A. ("BC Switzerland") (collectively the "BC Common Enterprise"), and Nikolai Simon Battoo ("Battoo"), have engaged in, are engaging in or are about to engage in violations of Sections 4b(a)(1)(A)-(C), 4o(1), and 4c(b) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1), and 6c(b) (2006 and Supp. III 2009) and Commission Regulations ("Regulations") 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012); and that this is a proper case for granting a preliminary injunction to preserve the *status quo*, protect Defendants' pool participants from further loss and damage, remove the danger of violation of the Act, the Act as amended, and Regulations, and enable the Commission to fulfill its statutory duties, the Court finds the following:

## I.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, the Act as amended, or any rule, regulation, or order thereunder.

2.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(e), in that Defendants transact

business in this District, and the acts and practices in violation of the Act and the Regulations have occurred, are occurring, or are about to occur within this district.

II.

FINDINGS OF FACT

A.    **Structure of the BC Common Enterprise**

3.    These findings are based on the materials described above, and it is worth noting that no defendant has appeared to contest the evidence; if and when they appear, then adversarial testing could alter the findings of fact, particularly relating to which entities are part of the BC Common Enterprise. But on the present record evidence, the Court makes the following findings. From at least January 2003 to the present, the BC Common Enterprise, by and through its agents, employees, and principals, including Battoo, solicited commodity pool participants, both residents of the United States and other countries, to invest in Private International Wealth Management and Private International Wealth Management – Insurance (collectively, "PIWM Portfolios"). The PIWM Portfolios functioned as a fund of funds, whereby Defendants invested pool participant funds into a variety of other hedge funds. Solicitation materials provided by Defendants to prospective pool participants stated that the PIWM Portfolios would engage in the trading of commodities, financial futures, and equities, along with other investment strategies. Based on these solicitations, at least 250 U.S. pool participants invested at least $140 million into the PIWM Portfolios.

4.     Battoo controlled each entity comprising the BC Common Enterprise and operated them as a common enterprise in connection with the PIWM Portfolios. Although each entity purportedly performed different functions in operating the PIWM Portfolios, Defendants did not differentiate between the various corporations in solicitation materials or in communications with pool participants. Instead, some corporations were mere shell entities with no actual offices. All actual operations of the BC Common Enterprise occurred at Battoo's office in London and his home office in Switzerland.

5.     BC Panama purports to be the "manager and managing company" of the PIWM Portfolios. Battoo is identified as the contact person for BC Panama in the 2009 Due Diligence Questionnaire that Defendants prepared and provided to pool participants.

6.     BC Hong Kong purports to be the "appointed financial investment advisor" to BC Panama. BC Panama and BC Hong Kong are "responsible for the customization and implementation (investment management) of the custom tailored PIWM portfolio strategies for each mandate." Battoo is identified as the principal of and contact for BC Hong Kong in the 2009 Due Diligence Questionnaire.

7.     BC London is an affiliated company to BC Hong Kong and purports to provide research and development for the PIWM Portfolios under contract to BC Hong Kong. Battoo operated out of the BC London office and used that office to meet with at least two U.S.-based investment advisors as part of his solicitation for investments in the PIWM Portfolios. Battoo hired BC London's manager and

supervised BC London's manager as a member of the PIWM Portfolios' "Investment Advisory Board."

8.     BC Switzerland is an affiliated company to BC Hong Kong and purports to provide research and development, along with trading and execution, under contract to BC Hong Kong. Battoo used BC Switzerland's office to call investment advisors in the United States about the status of redemption requests made by U.S. pool participants. Battoo is identified as the only contact person for BC Switzerland. The telephone number for BC Switzerland provided in the 2009 due diligence questionnaire is the same as for BC Panama and BC Hong Kong, which is further evidence of the common operation and control of the entities.

9.     Solicitation materials that Defendants provided to prospective pool participants did not distinguish between the different entities comprising the BC Common Enterprise. According to the organizational charts for the constituent entities, all entities comprising the BC Common Enterprise share the same "Pofessional [sic] Executive Board" and "Investment Advisory Board," with Battoo as Senior Advisor to the Investment Advisory Board. Battoo did not identify on behalf of which entity comprising the BC Common Enterprise he was acting when communicating with pool participants. Instead, account statements and letters to pool participants were written on "PIWM" and "PIWM-I" letterhead.

**B.     Defendants Solicitation of Pool Participants**

10.     The BC Common Enterprise, while acting as a Commodity Pool Operator ("CPO"), and Battoo, while acting as an Associated Person ("AP") of a

CPO, solicited pool participants, both directly and by soliciting U.S.-based investment advisors to recommend investments by their clients, at offshore conferences hosted by investment advisors between at least 2006 and 2010. Battoo, along with other agents or employees of the BC Common Enterprise, made presentations at the conferences about the PIWM Portfolios. Defendants provided prospective pool participants with copies of the 2009 Due Diligence Questionnaire and Power Point presentations describing the investment strategies used for the PIWM Portfolios. Defendants also provided prospective pool participants with one-page documents on PIWM letterhead that showed the purported monthly returns of the PIWM Portfolios since at least 2001 along with information on the underlying investments held by the portfolios (the "Tear Sheets").

11.    Defendants told prospective pool participants that a portion of the PIWM Portfolios would be used for futures trading. The 2009 Due Diligence Questionnaire identified "Financial Futures" and "Commodities" as part of the "Underlying Investments" made by the PIWM Portfolios. Moreover, the Tear Sheets given to pool participants indicated that a portion of the PIWM Portfolios is invested in "Multi-Strategy Futures & Commodities." The 2009 Due Diligence Questionnaire represented that Battoo was the registered principal of a Commodity Trading Advisor ("CTA") registered with the National Futures Association ("NFA") in the United States. The 2009 Due Diligence Questionnaire also stated that BC Hong Kong is affiliated with a registered CTA located in Singapore. The Power

Point presentations touted that Battoo is an "accomplished financial trader" with over fifteen years' experience specializing in the futures and commodities markets.

12.     Since at least January 2003, pool participants sent funds, directly or through offshore companies with the intent of investing in the PIWM Portfolios, to an account in the name of BC Panama. Defendants established at least eleven PIWM Portfolios in which U.S. pool participants invested funds (the "U.S. Participant Pools").

**C.     Investments and Trading on Behalf of PIWM Portfolios**

13.     The PIWM Portfolios functioned as a fund of funds, whereby Defendants invested pool participant funds into a variety of other hedge funds. Defendants told pool participants that the PIWM Portfolios would pursue several different strategies to generate returns, including futures trading. Although each PIWM Portfolio held slightly different combinations of funds, the underlying investments of each portfolio fall into three general categories: (a) hedge funds for which Battoo acted as investment advisor; (b) hedge funds and commodity pools operated by third parties; and (c) "Managed Accounts."

14.     Defendants told pool participants that a portion of the PIWM Portfolios was invested with five hedge funds for which Battoo acted as investment advisor: (a) FuturesOne Diversified Fund ("F1 Diversified"); (b) FuturesOne Innovative Fund ("F1 Innovative"); (c) Anchor Hedge Fund ("Anchor Fund"); (d) Galaxy Fund; and (e) Two Oceans Fund (collectively, the "Battoo-Operated Funds"). Each Battoo-Operated Fund contained multiple "share classes" in which the PIWM Portfolios

7

invested. Several share classes of F1 Diversified held trading accounts at futures commission merchants ("FCMs") in the United States and actively traded futures and options on futures contracts on U.S. exchanges.

15.     Defendants told pool participants that a portion of the PIWM Portfolios was also invested in various hedge funds operated by entities unaffiliated with Battoo. These investments included some of the largest global hedge funds, as well as commodity pools run by at least four third-party CPOs. At least three of these third-party CPOs are located in the United States.

16.     Defendants also told pool participants that Defendants traded a portion of the PIWM Portfolios in six "Managed Accounts." One "Managed Account" was termed "Multi-Strategy Futures & Commodities." Defendants told pool participants in the U.S. Participant Pools that up to 18.79% of their portfolios' funds were in the "Multi-Strategy Futures & Commodities" managed account.

**D.     Undisclosed Losses and Misrepresentations in 2008**

17.     Between April 2008 and October 2008, the PIWM Portfolios suffered significant losses that Defendants failed to disclose to pool participants. For example, as of December 31, 2008, the PIWM Portfolios held significant investments in six share classes of the Anchor Fund, Galaxy Fund, and F1 Diversified Fund ("Phi R2 share classes"). Between April 2008 and October 2008, the Phi R2 share classes suffered significant losses from trading on a London-based investment platform (the "Phi R2 Fund losses"). Because of the Phi R2 Fund losses,

the Anchor Fund, Galaxy Fund, and F1 Diversified Fund suspended redemptions of the Phi R2 share classes between October 13, 2008 and December 18, 2008.

18.    Battoo, as investment advisor to the Anchor Fund, Galaxy Fund, and F1 Diversified Fund, knew or was reckless in not knowing of the Phi R2 Fund losses and the resulting suspensions of redemptions. Defendants did not inform some PIWM Portfolio pool participants that a significant portion of their portfolios were negatively impacted by the Phi R2 Fund losses and the resulting suspensions of redemptions. Moreover, Defendants accepted additional funds from existing pool participants after the PIWM Portfolios suffered the Phi R2 Fund losses without disclosing such losses to pool participants.

19.    Defendants also made misrepresentations to pool participants about the PIWM Portfolios' exposure to the Ponzi scheme operated by Bernard Madoff. Tear Sheets that Defendants provided to pool participants indicated that, as of October 2008, between 7% and 20% of each PIWM Portfolio was invested in certain share classes of the Anchor Fund and Galaxy Fund ("Madoff share classes"). The Madoff share classes, in turn, ultimately invested in the Madoff scheme.

20.    Between December 18, 2008 and December 22, 2008, after the Madoff scheme was exposed and Madoff was arrested, the Anchor Fund and Galaxy Fund suspended redemptions of the Madoff share classes because of losses sustained in the Madoff scheme. As the investment manager of the Anchor Fund and Galaxy Fund, Battoo knew or was reckless in not knowing of the funds' suspensions of redemptions.

9

21.     Defendants knowingly, or at the very least recklessly, misrepresented the PIWM Portfolio pool participants' exposure to the Madoff scheme in correspondence Battoo sent to investment advisors in December 2008. In addition, Defendants knowingly or recklessly failed to disclose losses associated with the Madoff scheme when Battoo discussed the PIWM Portfolios' performance at a conference for current PIWM Portfolio pool participants held in Las Vegas, Nevada, in January 2009.

**E.     Misrepresentations of Value of Underlying Investments and Location of Funds**

22.     Defendants knowingly, or at the very least recklessly, made additional misrepresentations to pool participants as to the value of the underlying investments in the PIWM Portfolios and the location of the PIWM Portfolios' assets. In or around September 2009, Defendants sent or caused to be sent to pool participants in the eleven U.S. Participant Pools asset verifications conducted by the PIWM Portfolios' third-party administrator ("Asset Verifications"). These eleven Asset Verifications purportedly provided the value of investments made by the PIWM Portfolios as of December 31, 2008. While the Asset Verifications were issued by the third-party administrator, they were based on information provided to the third-party administrator by Defendants.

23.     The Asset Verifications overstated the net asset value of the U.S. Participant Pools' investments in commodity pools operated by four third-party CPOs. Although the Asset Verifications state that the U.S. Participant Pools had

10

investments worth over $21.8 million, the total value of all investments with these third-party CPOs made by any entity associated with Defendants totaled less than $8 million. At a minimum, the Asset Verifications overstate investments with the four third-party CPOs by $13.9 million.

24.    In addition, beginning in October 2011, Battoo knowingly, or at the very least recklessly, made misrepresentations to pool participants that the PIWM Portfolios were significantly impacted by the collapse of MF Global Inc., a registered FCM that filed for bankruptcy at the end of October 2011. Citing the MF Global collapse, the BC Common Enterprise suspended valuations and redemptions of PIWM Portfolios on November 11, 2011. Defendants told pool participants that all PIWM Portfolios were affected and, in a letter sent to pool participants on or about December 9, 2011, Battoo stated that, while "each portfolio would have a varying exposure to MF Global," the exposure ranged from 17% to 39% of each portfolio.

25.    Contrary to Battoo's statements to pool participants, MF Global had no "managed accounts" in the name of PIWM or the PIWM Portfolios. In fact, the only accounts with any connection to Defendants held less than $2.7 million in net liquidation value at the time of MF Global's bankruptcy, far less than the "17% to 39% of each portfolio" that Battoo claimed.

### III.

### CONCLUSIONS OF LAW

A.    **Defendants Violated Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C).**

26.    Sections 4b(a)(1)(A)-(C) of the Act makes it unlawful

11

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

7 U.S.C. §§ 6b(a)(1)(A)-(C)**Error! Bookmark not defined.** (Supp. III 2009).

27.    As set forth above, it is more likely than not that Defendants violated Sections 4b(a)(1)(A)-(C) of the Act by knowingly or recklessly making material misrepresentations, and knowingly or recklessly making material omissions, to pool participants regarding (1) the PIWM Portfolios' exposure to the Phi R2 losses and the Madoff scheme, (2) the value and location of assets purportedly held by the PIWM Portfolios, and (3) the PIWM Portfolio's exposure to the MF Global bankruptcy.

**B.    Defendants Violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1).**

28.    Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), prohibits fraudulent transactions by CPOs and APs of CPOs. Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A) (2006), makes it unlawful for a CPO, or an AP of a CPO, to employ any device, scheme or artifice to defraud any participant or prospective participant by use of instrumentalities of interstate commerce. Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006), makes it unlawful for a CPO, or an AP of a CPO, to engage in any

transaction, practice or course of business that operates as a fraud or deceit upon any participant or prospective participant by use of instrumentalities of interstate commerce.

29.    As set forth above, it appears to the satisfaction of the Court that there is good caused to believe Defendants violated Section 4o(1) of the Act by knowingly or recklessly making material misrepresentations, and knowingly or recklessly making material omissions, to pool participants regarding (1) the PIWM Portfolios' exposure to the Phi R2 losses and the Madoff scheme, (2) the value and location of assets purportedly held by the PIWM Portfolios, and (3) the PIWM Portfolios' exposure to the MF Global bankruptcy.

**C.    Defendants Violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulations 33.10(a)-(c), 17 C.F.R. § 33.10(a)-(c) (2012).**

30.    Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), provides that "[n]o person shall . . . enter into or confirm the execution of any transaction involving any . . . option . . . contrary to any . . . regulation of the Commission."  In turn, Regulations 33.10(a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2012), provide that:

> It shall be unlawful for any person directly or indirectly – (a) To cheat or defraud or attempt to cheat or defraud any other person; (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; (c) To deceive or attempt to deceive any other person by any means whatsoever[,] in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

31.    As set forth above, it is more likely than not that Defendants violated Sections 4b(a)(1)(A)-(C) of the Act and Regulations 33.10(a)-(c) by knowingly or

recklessly making material misrepresentations, and knowingly or recklessly making material omissions, to pool participants regarding (1) the PIWM Portfolios' exposure to the Phi R2 losses and the Madoff scheme, (2) the value and location of assets purportedly held by the PIWM Portfolios, and (3) the PIWM Portfolios' exposure to the MF Global bankruptcy.

D.     **Reasonable Likelihood of Future Violations and Reasonable Likelihood of Success on the Merits**

32.     As set forth above, it appears to the satisfaction of the Court that there is good cause to believe that Defendants' violations of the Act, the Act, as amended, and the Regulations, are likely to continue unless Defendants are restrained and enjoined from committing further violations.

33.     It further appears to the satisfaction of the Court that there is good cause to believe that Defendants' pool participants and members of the public may be cheated or defrauded, and that immediate and irreparable injury will occur to the Court's ability to grant effective final relief in the form of monetary redress, due to the withdrawal, transfer, removal, dissipation, concealment, or disposition of assets managed, controlled, or held for the benefit of Defendants, or the destruction of Defendants' books and records, unless Defendants are immediately restraining and enjoined by order of the Court.

34.     As set forth above, it appears to the satisfaction of the Court that there is a reasonable likelihood that the Commission will prevail on the merits of this action.

14

## IV.

## ORDER OF PRELIMINARY INJUNCTION

**IT IS THEREFORE ORDERED THAT:**

35.    Defendants and all persons insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of Defendants, and all persons insofar as they are acting in active concert or participation with Defendants who receive actual notice of this order by personal service or otherwise, are hereby restrained, enjoined and prohibited from directly or indirectly:

A.    Cheating or defrauding or attempting to cheat or defraud others; willfully making or causing to be made to others any false report or statement or willfully entering or causing to be entered for others any false record; or willfully deceiving or attempting to deceive any other persons by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such persons, in violation of Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009);

B.    Employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or

15

participant, in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1)
(2006); and

C.   cheating or defrauding or attempting to cheat or defraud any other
     person; making or causing to be made to any other person any false
     report or statement thereof or cause to be entered for any person any
     false record thereof; or deceiving or attempting to deceive any other
     person by any means whatsoever, in violation of Section 4c(b) of the
     Act, 7 U.S.C. § 6c(b) (2006), or Regulations 33.10(a)-(c), 17 C.F.R. §§
     33.10(a)-(c).

36.   Defendants and all persons insofar as they are acting in the capacity of
agents, servants, employees, successors, assigns, or attorneys of Defendants, and all
persons insofar as they are acting in active concert or participation with Defendants
who receive actual notice of this order by personal service or otherwise, are hereby
restrained and enjoined from, directly or indirectly, selling, encumbering, receiving,
concealing, changing, pledging, hypothecating, assigning, transferring, liquidating,
incurring debt upon, or otherwise disposing of, or withdrawing, any funds, assets or
other property in the possession, custody or control of any of the Defendants,
wherever located, including, but not limited to, all such funds and other assets held
at Newedge USA LLC and at Reed Smith LLP.

37.   Defendants Battoo, BC Panama, and BC Hong Kong and their agents,
servants, employees, attorneys, depositories, banks, and those persons in active
concert or participation with any one or more of them, and each of them, who

receive actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, facsimile transmission, email, or otherwise, are hereby restrained and enjoined from, directly or indirectly, transferring, selling, encumbering, receiving, concealing, changing, pledging, hypothecating, assigning, liquidating, incurring debt upon, or otherwise disposing of, or withdrawing, any funds, assets or other property (including money, real or personal property, securities, chose in action or any other form of asset or property of any kind whatsoever) referenced in Paragraph 36, which includes, but is not limited to, any and all accounts in the name of any one or more of the Defendants at any financial institution within the territory of the United States, and any and all accounts at any financial institution within the territory of the United States in which any of the Defendants has signatory authority or a beneficial interest, or which any Defendant directly or indirectly controls, owns or manages.

38.     Defendants are further restrained, enjoined and prohibited, until further order of the Court, from directly or indirectly destroying, mutilating, concealing, altering or disposing of, in any manner, any of the books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants, wherever located, including all such records concerning Defendants' business operations.

39.     Defendants are further restrained, enjoined and prohibited, until further order of the Court, from directly or indirectly:

A.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a);

B.    Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2011)) ("commodity options"), security futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

C.    Having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on their behalf;

D.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

E.    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

F.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and/or

G.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

V.

FORCE AND EFFECT

IT IS FURTHER ORDERED THAT:

40.    This Order shall remain in full force and effect until further order of this Court, and this Court retains jurisdiction of this matter for all purposes. The Commission is also authorized to conduct discovery on an expedited basis and before the scheduling of a discovery conference under Fed. R. Civ. P. 26(f).

## VI.

### ORDER APPOINTING A RECEIVER

**IT IS FURTHER ORDERED THAT:**

41.     Robb Evans & Associates LLC is appointed Receiver, with the full powers of an equity receiver, over Defendants and their affiliates and subsidiaries, and of all the funds, properties, premises, accounts, businesses, partnerships, sole proprietorships and any other kinds of assets directly or indirectly owned, beneficially or otherwise, managed or controlled by the Defendants, whether held in their own names or in the names of others ("Receivership Assets"). The Receiver shall be the agent of this Court in acting as Receiver under this Order.  The  Court had held off on appointing a receive during the TRO proceedings, in order to give the Defendants an opportunity to appear in the case and to provide (or at least start providing) the accounting that was previously ordered. But Defendants have not appeared and no accounting is forthcoming. In light of the number of interwoven entities, and the need to ascertain what happened to the funds that investors put into the BC Common Enterprise, the Court must now appoint Receiver to untangle the financial condition of the entities, under 7 U.S.C. § 13a-1(a). If the Receiver learns of evidence that disassociates one of the Defendants from the BC Common Enterprise, then the Receive must file a report with the Court within 2 business days of that discovery.

42.     The Receiver is directed and authorized to accomplish the following:

20

A.     Assume full control of the Receivership Assets by removing Defendants Battoo, BC Panama, BC Hong Kong, BC London, and BC Switzerland, and any officer, independent contractor, director, employee, or agent of the Defendants, from control and management of the affairs of the Defendants;

B.     Take exclusive custody, control, and possession of all Receivership Assets and other funds, property, and assets of, in the possession of, or under the control of the Defendants, wherever situated, the income and profits therefrom, and all sums of money, contracts or other instruments now or hereafter due or owing to the Defendants. The Receiver shall have full power to sue for, collect, receive and take possession of all goods, chattels, rights, credits, debts, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information, contracts, financial records, monies on hand in banks and other financial institutions, and other papers and documents of the Defendants and customers or clients whose interests are now held by or under the direction, possession, custody or control of the Defendants;

C.     Perform all acts necessary to conserve, hold, manage, and preserve the value of Receivership Assets, in order to prevent an irreparable loss, damage and injury to pool participants, and all acts incidental thereto, including the suspension of operations;

D.    Prevent the withdrawal or misapplication of funds entrusted to the Defendants, and otherwise protect the interests of pool participants;

E.    Manage and administer Receivership Assets by performing all acts incidental thereto that the receiver deems appropriate, including hiring or dismissing any and all personnel, suspending operations and/or entering into agreements, including but not limited to: (1) the retention and employment of investigators, attorneys or accountants of the Receiver's choice, including without limitation members and employees of the Receiver firm, to assist, advise, and represent the Receiver; and (2) the movement and storage of any equipment, furniture, records, files or other physical property of the Defendants;

F.    Collect all money, funds or property owed to the Defendants;

G.    Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal or foreign court that the Receiver deems necessary and advisable to preserve or increase the value of the assets of the Receivership Assets or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

H.    Choose, engage and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

I.    Issue subpoenas to obtain documents and records, and conduct discovery in this action, to the extent necessary to carry out the authority granted by this Order;

J.    Open one or more bank accounts as designated depositories for Receivership Assets. The Receiver shall deposit all Receivership Assets in such designated accounts and shall make all payments and disbursements from the accounts;

K.    Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Defendants prior to the date of entry of this Order, except for payments that the Receiver deems necessary or advisable to secure assets of the Defendants. As an initial matter, any expenses and fees associated with the administration of the receivership shall be paid out of funds held in the name of an individual retirement account of Nikolai Battoo by Morgan Stanley.

L.    Maintain written accounts itemizing receipts and expenditures, describing properties held or managed, and naming the depositories of Receivership Assets; make such written accounts and supporting documentation available to the Commission for inspection; and, within sixty (60) days of being appointed and periodically thereafter, as

23

directed by the Court, file with the Court and serve on the parties a report summarizing efforts to marshal and collect assets, administer the Receivership Assets, and otherwise perform the duties mandated by this Order.

43.     Pursuant to 28. U.S.C. § 754, the Receiver shall be vested with complete jurisdiction and control of all property, real, personal or mixed situated in different districts, with the right to take possession thereof and shall have capacity to sue in any district without ancillary appointment. The Receiver need not post the bond normally required by 28. U.S.C. § 754.

44.     Within five (5) business days following the service of this Order, each Defendant shall:

A.      Provide the Receiver with a full detailed accounting of all funds, documents, and assets, including assets located both inside and outside of the United States that are held by any Defendant for their benefit, or under their direct or indirect custody or control, whether jointly held or singly, and whether held in the name of a Defendant or any other name.

B.      Transfer to the territory of the United States and deliver to possession, custody, and control of the Receiver all funds, documents, and assets (other than real property) located outside of the United States that are held by each and every Defendant, for their benefit, or under their

direct or indirect custody or control, whether jointly held or singly, and whether held in the name of a Defendant or any other name.

C.    Provide the Receiver immediate access to all records of accounts or assets of the Defendants held by financial institutions located within or outside the United States.

45.    Defendants shall, within 24 hours of the issuance of this Order, cause to be prepared and delivered to the Receiver, a detailed and complete schedule of all passwords and identification (ID) numbers for all websites, electronic mail accounts, videophone accounts and all accounts at any bank, financial institution or brokerage firm (including any introducing broker or futures commission merchant) operated by or to which any of the Defendants has access.

46.    Defendants shall, within 24 hours of the issuance of this Order, cause to be prepared and delivered to the Receiver, a detailed and complete schedule of all desk top computers, laptop computers and or personal digital assistants (PDA) owned and/or used by them in connection with their business. The schedules required by this section shall include at a minimum the make, model and description of each, along with the location, the name of the person primarily assigned to use the computer and/or PDA, and all passwords necessary to access and use the software contained on the computer and/or PDA. The Commission shall be authorized to make an electronic, digital or hard copy of all of the data contained on the computer(s) and/or PDA(s).

47.    Immediately upon service of this Order upon them, Defendants, and any other person or entity served with a copy of this Order, shall immediately deliver over to the Receiver:

A.    Possession and custody of all funds, assets, property, and all other assets, owned (beneficially or otherwise) or in the possession, custody or control, of the

Defendants;

B.    Possession and custody of documents of the Defendants, including but not limited to all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers of the Defendants;

C.    Possession and custody of all funds and other assets belonging to members of the public now held by the Defendants;

D.    All keys, computer passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or documents of the Defendants, including but not limited to, access to the Defendants' business premises, means of communication, accounts, computer systems, or other property; and

E.    Information identifying the accounts, employees, properties or other assets or obligations of the Defendants.

26

48.     Defendants and all other persons or entities served with a copy of this order shall cooperate fully with and assist the Receiver. This cooperation and assistance shall include, but not be limited to, providing any information to the Receiver that the Receiver deems necessary to exercising its authority; providing any password required to access any computer or electronic files in any medium; and discharging the responsibilities of the Receiver under this Order, and advising all persons who owe money to the Defendants that all debts should be paid directly to the Receiver.

49.     Except by leave of the Court, during the pendency of the receivership ordered herein, the Defendants and all other persons and entities be and hereby are stayed from taking any action (other than the present action by the Commission) to establish or enforce any claim, right or interest for, against, on behalf of, in, or in the name of, the Defendants, the Receiver, Receivership Assets, or the Receiver's duly authorized agents acting in their capacities as such, including but not limited to, the following actions:

A.     Petitioning, or assisting in the filing of a petition, that would cause the Defendants to be placed in bankruptcy.

B.     Commencing, prosecuting, litigating or enforcing any suit or proceeding against any of the Defendants, or any of their subsidiaries or affiliates, except that such actions may be filed to toll any applicable statute of limitations;

C.      Commencing, prosecuting, continuing or entering any suit or proceeding in the name or on behalf of any of the Defendants, or any of their subsidiaries or affiliates;

D.      Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of the Defendants, or any of their subsidiaries or affiliates, or any property claimed by any of them, or attempting to foreclose, forfeit, alter or terminate any of the Defendants' interests in property, including without limitation, the establishment, granting, or perfection of any security interest, whether such acts are part of a judicial proceeding or otherwise;

E.      Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the Defendants, or any of their subsidiaries or affiliates, or the Receiver, or any agent of the Receiver; and

F.      Performing any act, or causing the performance of any act, whatsoever to interfere with the Receiver taking control, possession or management of the property subject to the receivership, or to in any way interfere with the Receiver or to harass or interfere with the

duties of the Receiver; or to interfere in any manner with the exclusive jurisdiction of this Court over the property and assets of the Defendants, or their subsidiaries or affiliates.

50.     Nothing in this Order shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Defendants.

VII.

BOND NOT REQUIRED OF PLAINTIFF

**IT IS FURTHER ORDERED** that:

Plaintiff Commission is an agency of the United States of America and, accordingly, no bond need be posted by the Commission.

**IT IS SO ORDERED**, at Chicago, Illinois on the 27th day of September 2012.

*Edmond E. Chang*

_____

United States District Judge